# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| DAVID ISRAEL GASTELUM CHAVEZ, | Case No. CV 14-7566 DMG (AGRx) |
| Petitioner, | |
| v. | **FINDINGS OF FACT AND CONCLUSIONS OF LAW** |
| LORETTA E. LYNCH, | |
| Respondent. | |

This matter is before the Court following a bench trial on February 16, 2016. Stacy E. Tolchin and Megan A. Brewer appeared on behalf of Petitioner David Israel Gastelum Chavez. Matthew B. George appeared on behalf of Respondent United States Attorney General Loretta E. Lynch.

Having carefully reviewed the evidence and the arguments of counsel, as presented at trial and in their written submissions, the Court issues the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

//

# I.

# FINDINGS OF FACT[1]

## A. Overview of Gastelum Chavez's Family History

On February 4, 1929, Gastelum Chavez's maternal grandmother, Maria de Jesus Vargas Olivo ("Grandmother Vargas"), was born to Vicente Vargas and Lorenza Olivo, both of whom were Mexican Citizens without United States citizenship. Setting aside the dispute as to where Gastelum Chavez's grandmother was born—whether in El Paso, Texas or in Ciudad Juarez, Chihuahua, Mexico—or where she grew up as an infant and toddler, both sides agree that she spent her childhood after 1933 in Mexico.

On December 22, 1951, Grandmother Vargas gave birth to Luz Elena Chavez Vargas ("Luz Elena Chavez"), Gastelum Chavez's mother, in Torreon, Coahuila, Mexico. Luz Elena Chavez's biological father was Raul Chavez Solis. Luz Elena Chavez testified that she was born as a result of Raul Chavez Solis having raped her mother. Grandmother Vargas never married Raul Chavez Solis or maintained a relationship with him. Instead, she married Francisco Lopez when Luz Elena Chavez was two years old. Lopez helped raise the young Luz Elena Chavez.

Growing up, Luz Elena Chavez had a strained relationship with Vargas, her mother. She believes that her mother made her pay the consequences for her biological father's actions. "She didn't love me," Luz Elena Chavez stated. Luz Elena Chavez left her mother's house in 1963 to live with her aunt in Tijuana, Mexico. Her aunt helped Luz Elena Chavez secure a "passport" so she could travel to the United States, where she hoped to earn money.

From December 1964 through at least 1977, Luz Elena Chavez spent the overwhelming majority of her time working in the United States. In December 1967, Luz Elena Chavez began dating Carlos Gastelum Romero ("Carlos Gastelum"). They met in

---

[1] To the extent any of the Court's findings of fact may be considered conclusions of law or vice versa, they are so deemed.

Tijuana, Mexico where he was born. Though she continued to work in the United States, Luz Elena Chavez married Carlos Gastelum in Mexico in May 1968.

On December 20, 1968, Luz Elena Chavez gave birth to Luz Elena Gastelum in Mexico. Daughter Luz Elena Gastelum had an estranged relationship with her mother, who was not present while she grew up. Grandmother Vargas, Luz Elena Gastelum's maternal grandmother, raised her.

Luz Elena Gastelum was eight years old when her mother gave birth to her brother, David Gastelum Chavez (Petitioner), on April 16, 1977 in Monterrey, Mexico. Gastelum Chavez grew up in Monterrey and Tijuana and was raised by an older woman named Dona Perfecta. He did not grow up with many of his other siblings, who were spread out amongst his uncles, aunts, and grandmothers. Like his oldest sister, Gastelum Chavez saw his mother only on rare occasions each year.

In 1993, Gastelum Chavez met Carolina Lopez. They married on February 16, 2001.

On December 23, 2015, Grandmother Vargas passed away in Mexico.

**B.     Procedural Background**

On July 22, 2008, Gastelum Chavez was deported to Mexico from the United States. He subsequently reentered the United States without authorization. On December 18, 2013, Gastelum Chavez was indicted and charged with illegal reentry after removal under 8 U.S.C. sections 1326(a) and (b)(2), having committed several aggravated felony offenses.

On May 15, 2014, a jury acquitted Gastelum Chavez. On June 11, 2014, the Department of Homeland Security arrested Gastelum Chavez and issued a reinstatement of removal. Gastelum Chavez subsequently filed a petition for review and request for stay of removal with the Ninth Circuit Court of Appeals. On July 14, 2014, Gastelum Chavez moved to transfer the case to the District Court so that it could conduct a *de novo* hearing on his claim to United States citizenship. On September 25, 2014, the Ninth Circuit granted Gastelum Chavez's motion. The Ninth Circuit placed Gastelum Chavez's

petition for review in abeyance pending the District Court's decision, and granted the motion for stay of removal pending review. *Gastelum Chavez v. Holder*, No. 14-71612 (9th Cir. Sept. 25, 2014).

Gastelum Chavez now seeks a declaratory judgment that he is a United States citizen under a derivative citizenship theory. Specifically, Gastelum Chavez asserts that he acquired United States citizenship from his mother, who in turn had acquired her American citizenship from Grandmother Vargas, who he claims was born in El Paso, Texas.

**C.     Disputed Factual Issues**

Whether or not Gastelum Chavez can prevail on this theory of derivative citizenship turns on the following four questions: (1) Was Gastelum Chavez's maternal grandmother born in the United States? (2) Did Gastelum Chavez's maternal grandmother reside in the United States before his mother's birth? (3) Was Gastelum Chavez's mother born out of wedlock? (4) Was Gastelum Chavez's mother physically present in the United States for at least 10 years before his birth?

**1.     Birthplace of Grandmother Vargas, Gastelum Chavez's Maternal Grandmother**

The parties disagree as to whether Gastelum Chavez's grandmother, Maria de Jesus Vargas Olivo, was born in El Paso, Texas or Mexico on February 4, 1929. The Court finds it more likely than not that Grandmother Vargaswas born in El Paso, Texas, and was therefore a United States citizen.

On June 15, 1929, Maria de Jesus Vargas Olivo was baptized at the Sacred Heart Church in El Paso, Texas. The church is located less than two blocks from Ciudad Juarez, just outside the U.S.-Mexican border.

Gastelum Chavez presents evidence of the Sacred Hearth Church's baptismal registry, which contains names and information for individuals baptized at the church. The church's current administrative assistant, Teresa Ortega, has worked at Sacred Heart for over 21 years. Ortega records the baptisms, confirmations, and marriages that take

1 place at the church.  She also gives this information out to certain parties who request it.
2 In relevant part, Ortega prepares certificates of baptism three to five times a week for
3 entities like the Texas vital statistics office, the American consulate, and the Mexican
4 consulate.  These certificates of baptism include information about the individual's place
5 of birth.  Ortega gathers information to be included in the certificate of baptism from the
6 church's baptismal registry.

7 This baptismal registry includes an entry for Maria de Jesus Vargas Olivo under a
8 column entitled, "Nomen Infantis et residentia."  The entry includes two additional lines
9 within the same column under Vargas' name which reads:  "de El Paso Tex" and "S. El
10 Paso 713."  The entry then has other columns that identify, among other things,
11 Grandmother Vargas' date of birth, the date of her baptism, and the names of her parents.

12 The administrative assistant who preceded Ortega trained her that a child whose
13 baptism was being recorded was born in El Paso, unless another location was identified.
14 For example, Ortega attested that an entry containing the location "Ciudad Juarez" or
15 "Deming, New Mexico," under the baptized child's name meant the child was born in
16 Ciudad Juarez or Deming, New Mexico, respectively.  Thus, based on her training,
17 Ortega interpreted the phrase "de El Paso Tex" to mean that Maria de Jesus Vargas Olivo
18 was born in El Paso.  This explains why the certificate of baptism for Grandmother
19 Vargas that Ortega prepared identifies El Paso, Texas as the birthplace.

20 The Sacred Heart Church's baptismal registry entry for Maria de Jesus Vargas
21 Olivo supports a finding that she was born in El Paso, Texas.

22 Gastelum Chavez also presents testimony from four of his family members, all of
23 whom consistently attested to hearing from another family member that his grandmother
24 was born in El Paso.  For instance, Luz Elena Chavez recalled that when President John
25 F. Kennedy died, her grandmother, Lorenza Olivo, told her:  "[T]hey killed the president
26 of the United States in the place where your mom was born."  Humberto Vargas, Luz
27 Elena Chavez's cousin, was similarly told by both his father (Grandmother Vargas'
28

1  brother) and Lorenza Olivo (his paternal grandmother) that his aunt, Vargas, was born in
2  El Paso.
3        Additionally, Grandmother Vargas herself told Humberto Vargas, Carolina Lopez,
4  and her granddaughter Luz Elena Gastelum that she was born in El Paso.  In particular,
5  when Luz Elena Gastelum was five or six years old, she overhead Francisco Lopez call
6  her grandmother Vargas a "Chicana" during a quarrel.  Luz Elena Gastelum asked her
7  grandmother, "What does 'Chicana' mean?"  Her grandmother explained that the term
8  refers to a person born in the United States, and that she herself was born in the United
9  States.  Grandmother Vargas told Carolina Lopez that she was born in El Paso during the
10 "Cristero War," when her parents and siblings fled Mexico.  This statement about fleeing
11 Mexico is consistent with an *El Paso Herald* news article from March 19, 1929—just
12 over one month after Gastelum Chavez's grandmother's birth—describing the United
13 States' policy of permitting Mexican refugees to seek sanctuary in this country.
14       The government attempts to rebut Gastelum Chavez's evidence as to Grandmother
15 Vargas' birthplace with seven documents:  six issued by Mexican governmental entities
16 and one by the United States Department of Labor.  None of these satisfy the
17 government's burden to establish with clear and convincing evidence that Gastelum
18 Chavez is not a United States citizen.  *See* discussion *infra*, Section II.
19       The government presents three birth records, a death certificate, and an
20 immigration manifest card that directly pertain to Grandmother Vargas.  First is a 1929
21 birth registration that the government obtained from the Local Civil Registry Office
22 located in Ciudad Juarez.  This birth registration bears the name "Maria de Jesus Vargas
23 Olivas [sic]" and identifies February 4, 1929 as the date of birth, Ciudad Juarez as the
24 place of birth, and "Vicente Vargas" and "Lorenza Olivas [sic]" as the parents.  The
25 document identifies a Ciudad Juarez address for the parents.
26       Second, the government presents a June 13, 2014 certified birth certificate, issued
27 by the Civil Registry in Ciudad Juarez, showing Vargas was born in Ciudad Juarez.  This
28

second document is based on information from the 1929 birth registration—it includes a certified copy of an extract of the 1929 birth registration.

The government then presents yet a third birth record: a September 12, 1997 birth certificate, issued by the San Luis Potosi Director of Civil Registry, which identifies Grandmother Vargas' birthplace as Villa Juarez, San Luis Potosi, Mexico.

A fourth document, Grandmother Vargas' death certificate from December 23, 2015, lists her place of birth as Villa Juarez, San Luis Potosi, Mexico.

A fifth document, a November 12, 1929 United States Department of Labor, Immigration Service manifest card shows Juarez, Chihuahua, Mexico in the "Place of birth" field.

The government's evidence purportedly showing Vargas' two different places of birth does not sufficiently outweigh the evidence presented by Gastelum Chavez under the applicable legal standard. With regard to the birth records issued by Mexican governmental entities, the two sets of records conflict with one another—one identifies Ciudad Juarez as Gastelum Chavez's grandmother's birthplace while the other identifies San Luis Potosi, two completely different places in Mexico.

On the other hand, Gastelum Chavez's evidence is consistent: the baptismal registry and all of the family members' testimony regarding family history identify El Paso, Texas as the birthplace. The anecdotal evidence regarding family history is both specific and credible. The government for its part fails to present evidence that would undermine the veracity or credibility of the Petitioner's witnesses' statements as to Grandmother Vargas' place of birth.

Accordingly, the Court credits Petitioner's evidence as to his grandmother's birthplace.

As for the manifest card, the Court accords this document little weight. The government did not present evidence explaining what exactly this manifest card is or its provenance. Counsel for the government at trial admitted: "I'm not exactly sure how [the immigration manifest] would have been used in 1929 but it was used as some sort of

arrival type document.  It may have been used as some sort of document to go back and forth.  I'm not sure, Your Honor."  Because the government's uncertainty over this document raises significant unanswered questions, the Court did not rely upon the information in this document.[2]

The government presents two other documents that more directly pertain to Luz Elena Chavez:  her April 23, 1952 birth certificate and her May 16, 1968 marriage certificate.  Both documents state that her mother, Vargas, was a native of or born in Ciudad Juarez, Chihuahua, Mexico.  For the reasons discussed *infra*, Section II, the Court questions the veracity of the statements asserted in these documents.  Accordingly, on the issue of Gastelum Chavez's grandmother's birth, the Court also accords little weight to these two documents.

### 2. Grandmother Vargas Resided in the United States

The Court finds it is more likely than not that Gastelum Chavez's grandmother resided in the United States before Luz Elena Chavez's birth.  Grandmother Vargas told Carolina Lopez that she and her parents stayed in El Paso from the time of her birth until she turned three or four years old.  Moreover, the address listed under Grandmother Vargas' name in the Sacred Heart Church registry, "S. El Paso 713," is located in El Paso, Texas according to the 1928 and 1929 El Paso city directories.

The government fails to undermine the credibility of Carolina Lopez's testimony.  Instead, the government relies solely on five manifest cards for Vargas and her parents to show that she resided in Ciudad Juarez and never in El Paso.  For the reasons already discussed, the Court does not accord the manifest cards much weight.

//

---

[2] Gastelum Chavez also relies upon Maria de Jesus Vargas Olivo's manifest card as well as the manifest cards for Vicente Vargas and Lorenza Olivo.  Yet, Gastelum Chavez's counsel similarly struggled to elucidate the purposes that the manifest card served:  "The manifest card, it's not clear if this was given as a sort of permit to allow people to live or if it was an entry.  We don't really know.  Our systems now are different. . . ."

### 3. Gastelum Chavez's Mother was Born Out of Wedlock

The Court finds it more likely than not that Gastelum Chavez's mother, Luz Elena Chavez, was born out of wedlock. Luz Elena Chavez's biological father, Raul Chavez Solis, raped her mother Maria de Jesus Vargas Olivo. Luz Elena Chavez was the product of rape committed by a man who never married her mother. This explains why Luz Elena Chavez's mother had a strained relationship with her and would say to her, "Don't look at me. You have the face of that dog." It also clarifies why Vargas never married or lived with Raul Chavez Solis, why Luz Elena Chavez never spent time with her biological father, and why Luz Elena Gastelum and David Gastelum Chavez never met their biological grandfather.

To rebut this claim that Luz Elena Chavez was born out of wedlock, the government offers two documents: the 1952 birth certificate of Luz Elena Chavez and the 1968 marriage certificate between Luz Elena Chavez and her husband Carlos Gastelum. The 1952 document states that Grandmother Vargas was married and that Luz Elena Chavez is the "first born of her legitimate children of her husband Raul Chavez Solis, Mexican, married." Luz Elena Chavez's testimony contradicts this assertion. She testified that while Grandmother Vargas never reported the rape, she did tell the priest at the church that both she and Raul Chavez Solis attended. The priest then forced Raul Chavez Solis to identify himself as the husband of Vargas on their daughter's birth certificate because it was anathema at that time to have an illegitimate child.

The Court finds this explanation credible. Indeed, the disgrace and societal shame that out-of-wedlock birth mothers and their "illegitimate" children faced is supported by Luz Elena Gastelum's testimony that her mother Luz Elena Chavez was treated as "less" by her siblings because she was the product of rape.

It also explains why Luz Elena Chavez's marriage certificate states that her biological parents—Raul Chavez and Maria de Jesus Vargas—"Both" lived at the same address in Torreon, Mexico. When applying for this marriage certificate, Luz Elena Chavez had to show her birth certificate and did not want to recount the story of her

mother's rape in front of everyone.  The Court finds the assertion made in this 1968 document that Luz Elena Chavez's biological parents lived together to be unreliable and, more likely than not, untrue.

### 4. Gastelum Chavez's Mother's Physical Presence in the United States

The Court finds it is more likely than not that Gastelum Chavez's mother, Luz Elena Chavez, was physically present in the United States for at least 10 years prior to his birth.  Starting in December 1964 through April 16, 1977, Luz Elena Chavez, worked in the United States for various families, taking care of children, cleaning homes, and washing pets.  She also worked as a factory work and street vendor.

Starting in 1965, when she was either 13 or 14 years old, Luz Elena Chavez began a generalized pattern of travel to the United States.  In one year, she spent almost all of her time in the United States with a few exceptions.  She went down to Mexico for long weekends and holidays (e.g., Labor Day, Memorial Day, Christmas, New Year's Day), which typically amounted to 13 days out of the year.  When she became pregnant, Luz Elena Chavez would return to Mexico 15 days before giving birth.  She then stayed in Mexico for another 40 days after the child's birth before returning to the United States.  Between December 1968 and April 16, 1977, Luz Elena Chavez gave birth to five children.  Applying this formula to the time period between December 1964 and April 16, 1977, and accounting for specifics in Luz Elena Chavez's testimony, the Court finds that her testimony cumulatively establishes that the number of days she spent in the United States before Petitioner was born exceeded 10 years or 3650 days.  This is consistent with the testimony of her children who stated that they rarely saw their mother during the year.[3]  In particular, Luz Elena Gastelum testified that Luz Elena Chavez handed her five children out to different family members like "puppies" and that she developed a "resentment towards the loneliness" she experienced in her mother's absence.

---

[3] As a child, Luz Elena Gastelum recalls seeing her mother only on rare occasions such as Christmas or family parties.  Because she cried when her mother left, family members would tell Luz Elena Gastelum to go to the bathroom or the store while her mother made her exit.  When she returned, her mother would be gone:  "All I knew is that she left.  She was gone.  She would go," Luz Elena Gastelum testified.

The government challenges Gastelum Chavez's evidence primarily by attacking Luz Elena Chavez's credibility. For instance, the government points to inconsistencies between statements Luz Elena Chavez made at the 2014 criminal trial, her August 2015 deposition, and during cross-examination at the bench trial, regarding her time spent working in the United States. The government's counsel states that at the criminal trial, Luz Elena Chavez testified to having spent approximately 24 days a year outside of the United States during years when she was not giving birth, while at the bench trial she testified the number was 13 to 16 days. The testimony is indeed inconsistent.

Nonetheless, the Court does not find such minor inconsistencies to be clear and convincing evidence that Luz Elena Chavez did not satisfy the 3650-day threshold. Even if the Court considers the higher estimate for the days spent outside of the United States, Luz Elena Chavez's presence in the United States does not fall below the threshold. Counsel for the government conceded as much during his closing argument: "Now, yes, looking at them in a sort of minimum number of days' light, she may have said cumulatively she meets the 3,650 days. However, the bigger point is nothing she's provided regarding the physical presence can be relied upon because she's inconsistent." In the Court's view, the bigger point is that Luz Elena Chavez's testimony about her estimated time in the United States from December 1964 to April 1977 placed her in country within a range of time that exceeded ten years or 3650 days.

## II.

## CONCLUSIONS OF LAW

The Court determines Petitioner's citizenship claim *de novo*. 8 U.S.C. § 1252(b)(5)(B). In this proceeding, the government "bears the ultimate burden of establishing all facts supporting deportability by clear, unequivocal, and convincing evidence." *Mondaca-Vega v. Lynch*, 808 F.3d 413, 419 (9th Cir. 2015); *Chau v. INS*, 247 F.3d 1026, 1029 n. 5 (9th Cir. 2001). But when the government offers evidence of foreign birth, a "rebuttable presumption of alienage" arises, "shifting the burden to the [alleged citizen] to prove citizenship." *Mondaca-Vega*, 808 F.3d at 419; *Morales-*

*Martinez v. Gonzales*, 2008 U.S. Dist. LEXIS 120673, at *11 (E.D. Cal. May 23, 2008) ("[O]nce birth in a foreign country is established, there is a presumption of alienage and the petitioner bears the burden of establishing, by a preponderance of the evidence, a valid claim to United States citizenship.").

If the petitioner produces "substantial credible evidence" of his citizenship claim by the preponderance of the evidence, the alienage presumption bursts and the burden shifts back to the government to prove by "clear and convincing evidence" that it can deport the petitioner. *Mondaca-Vega*, 808 F.3d at 419; *Ayala–Villanueva v. Holder*, 572 F.3d 736, 737 n. 3 (9th Cir.2009).

In analyzing a petitioner's derivative citizenship claim, the Court applies the law in effect at the time of the petitioner's or the alleged citizen's birth. *See United States v. Ahumada-Aguilar*, 189 F.3d 1121, 1124 (9th Cir. 1999) ("The applicable law for transmitting citizenship to a child born abroad when one parent is a U.S. citizen is the statute that was in effect at the time of the child's birth.").

Here, the Court must apply two different statutes. As Luz Elena Chavez was born in 1951, the applicable law is 8 U.S.C. § 601 (1947), which sets forth the following parameters for United States citizenship for a person born outside of the United States to a United States citizen-parent:

> A person born outside the United States and its outlying possessions of parents one of whom is a citizen of the United States who, prior to the birth of such person, has had ten years' residence in the United States or one of its outlying possessions, at least five of which were after attaining the age of sixteen years, the other being an alien: *Provided*, That, in order to retain such citizenship, the child must reside in the United States or its outlying possessions for a period or periods totaling five years between the ages of thirteen and twenty-one years . . . .

For children born out of wedlock to a United States citizen mother, however, citizenship is acquired at birth so long as the mother "previously resided in the United States. . . ." 8 U.S.C. § 605 (1947).

Section 504 defines "residence" as the "place of general abode." 8 U.S.C. § 504 (1940). Courts have interpreted residence under section 504 to mean "the principal dwelling place of a person, without regard to intent." *Alcarez-Garcia v. Ashcroft*, 293 F.3d 1155, 1157 (2002) (internal quotation marks and citation omitted).

As Gastelum Chavez was born in 1977, the other applicable law is 8 U.S.C. § 1401 (1977), pertaining to persons born outside of the United States to a United States citizen-parent:

> [A] person born outside the geographical limits of the United States or its outlying possessions of parents one of whom is an alien, and the other a citizen of the United States who, prior to the birth of such person, was physically present in the United States or its outlying possessions for a period or periods totaling not less than ten years, at least five of which were after attaining the age of fourteen years. . . .

As the government presented evidence of Gastelum Chavez's foreign birth, which he does not contest, a rebuttable presumption of alienage arose, shifting the burden to Petitioner to establish a valid claim to citizenship. To satisfy his burden under the relevant statutes, Gastelum Chavez must first prove by a preponderance of the evidence that his mother Luz Elena Chavez was born a United States citizen by establishing three facts: (1) Grandmother Vargas was born in the United States; (2) Grandmother Vargas previously resided in the United States prior to Luz Elena Chavez's birth; and (3) Luz Elena Chavez was born out of wedlock.

For Gastelum Chavez to establish his citizenship is derived from his mother, Luz Elena Chavez, he must then show a fourth fact: (4) his mother was physically present in the United States for not less than 10 years prior to April 16, 1977, at least five of which were after she turned 14 years old.

Substantial credible evidence presented by Gastelum Chavez demonstrates it is more likely than not that Gastelum Chavez's grandmother was born in the United States. This is consistent with the entry for her name in the baptismal registry from the Sacred Heart Church in El Paso, Texas, as well as multiple family member statements. The evidence also demonstrates that it is more likely than not that Gastelum Chavez's grandmother resided in the United States until the age of three or four years old. This is what Grandmother Vargas herself told Carolina Lopez. The address "S. El Paso 713" listed in the Sacred Heart Church baptism registry under Grandmother Vargas' name further indicates that baby Maria de Jesus Vargas Olivo resided at this hotel in El Paso with her parents for certainly at least one day around the time of her baptism.[4] Further, the evidence demonstrates that Gastelum Chavez's mother was, more likely than not, born out of wedlock—multiple witnesses testified to the family history that Raul Chavez Solis raped Gastelum Chavez's grandmother, who then gave birth to Gastelum Chavez's mother as a result. The testimony also consistently confirmed that Raul Chavez Solis never married Gastelum Chavez's grandmother. Therefore, the Court finds it, more likely than not, that Petitioner's mother was a United States citizen.

As to facts concerning whether Gastelum Chavez derived citizenship from his mother, the Court finds it more likely than not that his mother spent at least 10 years prior to his birth in the United States working primarily as a babysitter, nanny, or housekeeper. This is consistent with not only Luz Elena Chavez's own testimony, but that of her children who testified growing up in Mexico without their mother.

---

[4] In fact, the government concedes that "as little as one day could be enough to satisfy [the statute's residence requirement] if there is one day of residence, as legally defined" by 8 U.S.C. § 504. The government asserts that Maria de Jesus Vargas Olivo and her family lived in Ciudad Juarez before and after the birth. But given Ciudad Juarez's proximity to the Sacred Heart Church, the Court questions why an El Paso address would have been listed in the birth registry if Maria de Jesus Vargas Olivo and her family actually resided in Ciudad Juarez. Numerous other entries in the registry from 1929 include addresses in Mexico for the participants.

Based on these findings, the Court concludes that Gastelum Chavez satisfied his burden of producing substantial, credible evidence that he is a United States citizen.

Having done so, the burden then shifted to the government to show by clear and convincing evidence that Gastelum Chavez is not a United States citizen. To satisfy this "intermediate burden of proof," the government must show "an abiding conviction that the truth of [the] factual contentions" at issue is "highly probable." *See Mondaca-Vega*, 808 F.3d at 422 (internal quotation marks and citation omitted).

The government has failed to do so. First, as to the birthplace of Gastelum Chavez's grandmother, the government presents dueling birth certificates, one identifying her birthplace as Ciudad Juarez and the other as San Luis Potosi. The government takes no position on which birth record is the valid one, only that they both state the grandmother was born in Mexico. But balancing these conflicting documents against the baptismal registry as well as multiple family members' consistent statements that identify El Paso as the birthplace—the credibility of which the government has failed to undermine—the Court finds that the government has not presented clear and convincing evidence that Grandmother Vargas was born in Mexico.

Second, as to Petitioner's mother's citizenship, the government has not demonstrated that it is highly probable that Luz Elena Chavez was born in wedlock. Although the birth and marriage certificates for Luz Elena Chavez identify Maria de Jesus Vargas Olivo's birthplace as Ciudad Juarez, these two documents do not outweigh credible testimony that Maria de Jesus Vargas Olivo was raped and that the parish priest forced the biological father to identify himself as the baby's father and the victim's husband on the baby's birth certificate. The government does not present the Court with clear and convincing evidence to undermine the credibility of the witnesses who discussed the rape of Grandmother Vargas and the circumstances of Luz Elena Chavez's birth. As for whether Grandmother Vargas previously resided in the United States during the first days or years of her life, the government has not demonstrated by clear and convincing evidence that she did not.

Finally, as to Petitioner's citizenship, the government has not established by clear and convincing evidence that Luz Elena Chavez spent less than 10 years in the United States prior to Petitioner's birth.

In sum, the government has failed to carry its burden of presenting clear, unequivocal, and convincing evidence that Gastelum Chavez is not a United States citizen.

### III.
### CONCLUSION

In light of the foregoing, the Court finds as follows (1) Gastelum Chavez's grandmother, Maria de Jesus Vargas Olivo, was, more likely than not, born in the United States; (2) under 8 U.S.C. §§ 601, 605 (1947), Gastelum Chavez's mother, Luz Elena Chavez, derived her United States citizenship from Gastelum Chavez's grandmother; (3) under 8 U.S.C. § 1401 (1977), Gastelum Chavez derived his United States citizenship from his mother, Luz Elena Chavez; and (4) as a United States citizen, David Gastelum Chavez is not removable.[5]

The Ninth Circuit Court of Appeals stayed its proceedings and transferred this matter to this Court for the limited purpose of issuing a declaratory judgment on Petitioner's citizenship claim. The Clerk shall forthwith certify the trial record, this order, and the declaratory judgment to the United States Court of Appeals for the Ninth Circuit for such further proceedings as it deems appropriate.

DATED: August 16, 2016

                                          DOLLY M. GEE
                                  UNITED STATES DISTRICT JUDGE

---

[5] The Court hopes that Mr. Gastelum Chavez will view this finding of United States citizenship as an opportunity to begin a new chapter in his life and to push the "reset" button on what already has been an all too lengthy criminal history.